UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN MORRIS ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:13-cv-389 |
| v. ) | |
| ) | Judge Sharp |
| GENSPRING FAMILY OFFICES, LLC ) | |
| and SUNTRUST BANKS, INC. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the Court is Defendants' fully-briefed motion for summary judgment. For the reasons that follow, the Court will DENY summary judgment as to whether Plaintiff's right to a single incentive award was contingent on his following Defendant's administrative process to trigger such a payment, but will GRANT summary judgment as to all other issues.

## BACKGROUND

From March 2006 until December 30, 2012, Plaintiff John Morris worked as a Wealth Management Strategist for Defendant GenSpring Family Offices, LLC, of which Defendant SunTrust Banks, Inc. was the majority owner. (Docket No. 1-1 at 4–5). GenSpring is a wealth-management firm that provides financial advice and family-office services to high-net-worth families and investors. (*Id*. at 4). Morris's job was to get such families and investors to park their money with GenSpring. For this work, Morris was well compensated: his initial pay package, for instance, included a $210,000 annual salary, a restricted stock grant of 3,500 shares in SunTrust Banks (worth more than $240,000 when Morris started with the company), and a performance-based incentive award of at least $157,000. (Docket No. 28-1 at 28–30).

1

The dispute at the heart of this case relates to commission payments Morris believes GenSpring owed him under an incentive plan that was in effect when GenSpring terminated Morris in late 2012 in connection with a reduction in force (RIF). Before getting to what Morris thinks he's entitled to, it is important to sketch out some of the Plan's structural features.

GenSpring's 2012 Plan consisted of two types of incentive awards. The first were "initial incentive payments" that were based on a percentage of certain fees GenSpring earned for the first 12 months after a new client funded an account. The second were "trailers," which were also based on a percentage of certain fees GenSpring earned but were paid into the first, second, and third full years after the account was opened. (Docket No. 1-1 at 13–15). As an example, the incentive award on one type of account would entitle Morris to 35% of GenSpring's fees over the initial 12-month period, and then 5% of those fees in the first, second, and third full years. (*Id*.).

The Plan paid incentive awards on a monthly basis based on fees an employee's accounts generated during a month-long "Performance Period." (*Id*. at 13). There was a lag time, however, between the time when an employee earned an incentive award and when GenSpring paid it. The 2012 Plan required GenSpring to pay out incentive awards "as soon as possible after the end of each Performance Period, which is typically, but not guaranteed to be, thirty to sixty (30-60) days after the close of the Performance Period." (*Id*. at 13).

With that context, understanding what Morris believes GenSpring owes him becomes a more simple endeavor. Morris first learned from Steve Barimo, GenSpring's outgoing Chief Marketing Officer, on November 28, 2012, that GenSpring planned to terminate him by year's end. (*Id*. at 5). Barimo allegedly assured Morris that he would receive "accelerated commissions" for client accounts Morris had secured—presumably meaning all remaining

initial-incentive payments and trailers on Morris's accounts that began generating qualifying fees before his departure. (*Id*.). Morris also says the pair discussed a process to "earmark" incentives from prospective clients that Morris was working on so that Morris could be compensated if those clients got on board with GenSpring after Morris left. (Docket No. 28-1 at 8).

Days later, on December 3, Morris spoke to Michael Woocher, GenSpring's incoming Chief Marketing Officer, about the same two issues. He says that Woocher similarly confirmed that Morris would be paid both the accelerated commissions and earmarked incentives. (*Id*. at 24; Docket No. 1-1 at 6). Morris speculates that Barimo and Woocher believed he would get those two forms of incentive pay because GenSpring paid them out to several former employees it terminated as part of a RIF in 2008. (Docket No. 1-1 at 5–6; Docket No. 28-1 at 25–26).

The day after speaking to Woocher, Morris emailed Diana Hernandez, a GenSpring Human Resources Associate, asking to review incentive payments due to him under the 2012 Plan. (Docket No. 28-1 at 28 & 99). After some back and forth, Hernandez got back to Morris with hard numbers on December 10. She wrote:

> If we are not notified of any changes to the accounts i.e. account closure or fee adjustments, here is what was estimated for 12/31 and 01/31 payments:
> 12/31 - $7,711.20
> 01/31 - $7,711.20
> Total - $15,422.40
> Please note: trailers are only paid to individuals for their continued employment, so the above payments are all that is owed beyond your last day of employment.

(*Id*. at 103–04).

Even in the face of Hernandez's response, Morris still held out hope that he would get accelerated commissions and earmarked incentives, due, he alleges, to Woocher's continued assurances. (Docket No. 1-1 at 6). Woocher, Morris says, expressed "surprise[]" that GenSpring

3

would not pay both types of commissions, and he told Morris that he would "work on" the problem. (*Id.*). On December 17, however, Woocher confirmed that Morris would not receive incentive payments of either kind after his termination date. (*Id.* at 7).

Morris filed a three-count complaint in Chancery Court on March 22, 2013, (*id.* at 2), and GenSpring removed the matter to this Court on April 26, (Docket No. 2-1 at 1–2). On January 23, 2014, the parties stipulated to the dismissal of two counts in Morris's original complaint. (Docket No. 20 at 1). All that remains is his breach-of-contract claim, on which GenSpring now seeks summary judgment.

## **LEGAL STANDARD**

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477

4

U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## **ANALYSIS**

In Georgia,[1] as elsewhere, "the construction of a contract is a question of law" that "involves three steps":

> The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Bd. of Comm'rs of Crisp Cnty. v. City Comm'rs of City of Cordele*, 727 S.E.2d 524, 526–27 (Ga. Ct. App. 2012) (footnotes and internal quotation marks omitted).

In this case, the inquiry begins—and ends—with the 2012 Plan's clear and unambiguous language. Three Plan terms in particular make clear that Morris, despite his insistence to the contrary, is entitled to neither accelerated commissions for existing accounts nor earmarked incentives for prospective ones. First, the 2012 Plan includes an active-employment requirement: "Except as provided elsewhere in this Plan document, a Participant must be actively employed on the first day of the payroll cycle in which an award is paid to be eligible to receive that award." (Docket No. 1-1 at 18). Second, for employees like Morris who are terminated due to a RIF, the 2012 Plan cuts out a limited exception to the active-employment requirement:

Reduction in Workforce ("RIFs")

---
[1] The parties agree that Georgia law governs the interpretation of the 2012 Plan. (Docket No. 1-1 at 19).

> A Participant whose employment terminates . . . before the first day of the payroll period in which an award is paid . . . will be eligible to receive a pro-rated award for the portion of the Performance Period during which the Participant was actively employed in an eligible position. The payment will be made to the Participant in accordance with the terms of the Plan.

(*Id*. at 19). Finally, no changes can be made to the Plan unless a specific process is observed:

> [SunTrust] retains the absolute and unconditional right at all times to amend or terminate all or any portion of the Plan by written instrument signed by the Plan Owner. Amendments to the Plan require a Plan addendum and approvals in accordance with [Human Resources] Guidelines.

(Docket No. 1-1 at 16). (The section of the Plan that contains the first two provisions also contains a parallel prefatory warning: "No modifications, changes, or overrides can be made to the items described in this section[.]" (*Id*. (emphasis omitted)).

An example helps to illustrate how the active-employment requirement and the RIF exception to it interact. Assume an employee earns incentive pay during the January Performance Period. Assume further that GenSpring, consistent with its commitment to deliver incentive pay within 30 to 60 days after the end of that period, pays the employee his January award on February 28. (GenSpring pays employees on the fifteenth and last days of each month and so has 24 payroll periods each calendar year. (Docket No. 25 at 2).) If the employee was terminated on January 27 and the RIF exception did not apply, GenSpring would not owe him any incentive pay for January, as he was not "actively employed on the first day of the payroll cycle in which an award is paid"—here, February 16. But if the employee was terminated on January 27 as a result of a RIF, GenSpring would owe him roughly 87% of his January incentive pay, a pro-rated amount that accounts for the fact that he "was actively employed in an eligible position" for 27 of 31 days in the January Performance Period.

The Court discerns no ambiguity in these Plan provisions, which, taken together, negate Morris's breach-of-contract claim. The Plan curbs Morris's demand for accelerated commissions—*i.e.*, projected commissions for Performance Periods that had not yet occurred—because Morris was not "actively employed on the first day of the payroll cycle in which [such] an award [would be] paid." (Docket No. 1-1 at 18). And that provision just as plainly precludes Morris's request for earmarked incentives for prospective accounts.

Morris contends that the 2012 Plan's terms are ambiguous. (Docket No. 32 at 12–18). But he never explains how the Plan's terms may be susceptible to different meanings. All that Morris argues in support of his ambiguity claim is that GenSpring employees had different understandings of the incentive awards to which he was entitled. But what Barimo, Woocher, or others may have thought is of little import if the Plan language is clear that Morris cannot get what he now seeks. Moreover, no one Morris talked to when trying to determine the commissions GenSpring owed him either had the authority to alter the Plan's active-employment requirement or followed the amendment process the Plan specified. (*See* Docket No. 1-1 at 16).

Morris also wants the benefit of the "precedent" GenSpring set when it allegedly paid the commissions Morris now demands to employees terminated in an earlier RIF in 2008. But that history is irrelevant to Morris's claim. Those earlier-terminated employees labored under GenSpring's 2008 Incentive Plan, which is substantively different from the 2012 Plan at issue here; notably, the 2008 Plan lacked an express active-employment term. (*See* Docket No. 25-1 at 5–6). Perhaps more to the point, "Georgia law is well established that matters outside a contract cannot be used to vary or explain the unambiguous terms of an agreement." *Wright v. Safari Club Int'l, Inc.*, 745 S.E.2d 730, 735 (Ga. Ct. App. 2013) (internal quotation marks omitted). The 2012 Plan's clear terms stand in the way of using the 2008 precedent as Morris hopes.

Without a doubt, "the cardinal rule of contract construction is to ascertain the intention of the parties." *Bd. of Comm'rs of Crisp Cnty.*, 727 S.E.2d at 527 (internal quotation marks and footnote omitted). But "when a written contract's- terms are clear and unambiguous"—as they are here with respect to the active-employment requirement and the RIF exception to it—"the court cannot go beyond the contract itself and must confine itself to the contract alone to find the parties' intent." *Id*. at 528 (internal quotation marks and footnote omitted). Whether fair or not, and whether understood by all GenSpring employees or not, the terms of 2012 Plan clearly and unambiguously operate to bar Morris's remaining claim.

The parties also quarrel about commissions Morris believes GenSpring owes him related to three clients Morris sought to lure in during his final days at GenSpring. As to the first, Deborah Butler, GenSpring says it owes Morris nothing because Butler's account generated no qualifying fees under the 2012 Plan. (Docket No. 22 at 17). Morris does not contest this.

As to the second, Tom Kartsoris, GenSpring similarly claims that Kartsoris's account did not generate any qualifying fees under the 2012 Plan, since this transaction closed on January 22, 2013, several weeks after Morris's termination. (*Id*.). Morris admits as much, (*see* Docket No. 35 at 22–23), but nonetheless complains about the manner in which GenSpring pulled him off the Kartsoris account months earlier, (Docket No. 32 at 19–20). The specifics of GenSpring's account-assignment process, however, do not matter. What does—and what Morris does not dispute—is that the Kartsoris account did not generate revenue until after Morris left GenSpring. Under the unambiguous terms of the 2012 Plan, that alone bars Morris's claim to commissions stemming from this transaction.

The third and final prospective client whose fees Morris contends belongs to him, Leila Strauss, adds a slightly more complicated twist. GenSpring concedes that Strauss was one of

8

Morris's prospective clients in December 2012 and that her newly opened account generated a $100,000 fee for the company that month. (Docket No 27 at 4). GenSpring calculates that if it owed Morris a commission on this account, he would be paid $2,916.67 (35% of $100,000 divided by 12 months) on January 31, 2013. (*Id.*). Still, GenSpring argues that Morris was not entitled to a commission on the Strauss account because he did not follow the company's bureaucratic process to trigger payment of the award. (*Id.*).

Morris disputes that his right to a commission on the Strauss account was contingent on complying with the bureaucratic process that GenSpring describes. He says that "during [his] six years with GenSpring, [his] ability . . . to receive commissions on an account was never dependent on [his] notification of anyone with GenSpring or SunTrust with respect to an executed fee-generating agreement or otherwise." (Docket No. 33 at 1). Moreover, Morris claims that he told Barimo that he was entitled to commissions from the Strauss account and that this notification was sufficient to get his award. This dispute, as GenSpring rightly concedes, is a factual issue a jury will have to resolve.

In sum, Morris has failed to raise a genuine issue of material fact with respect to his claim that GenSpring's failure to pay him accelerated commissions for existing clients and earmarked incentives for prospective clients breached the 2012 Plan. That said, Morris has raised a slender (though material) factual issue as to whether GenSpring owes him a commission on the Strauss account, even though he did not follow the company's administrative process to trigger payment of the commission.

## **CONCLUSION**

For the reasons stated, the Court will DENY summary judgment as to whether Plaintiff's right to a single incentive award was contingent on his following Defendant's administrative process to trigger such a payment, but will GRANT summary judgment as to all other issues. The Court encourages the parties to resolve the remaining dispute before trial.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE